## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ALLISON ADVENT | ) | |
| | ) | CASE NO.    1:11-CV-2130 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Allison Advent ("Advent ") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Advent's claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(I), 423, *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

## I.  Procedural History

On May 15, 2008, Advent protectively filed an application for POD and DIB alleging a disability onset date of January 1, 2007.  Her application was denied both initially and upon reconsideration. Advent timely requested an administrative hearing.

On December 7, 2010, an Administrative Law Judge ("ALJ") held a hearing during which Advent, represented by counsel, and an impartial vocational expert ("VE") testified.  On January 20, 2011, the ALJ found Advent was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### Personal and Vocational Evidence

Age twenty-eight (28) at the time of her administrative hearing, Advent is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c).  She has a high school education and past relevant work as a sales clerk in a boutique and as a hotel clerk supervisor. (Tr. 19, 34, 35.)

### Relevant Medical Evidence[1]

### A.        Treatment Evidence

Kevin Bogar, M.D., was Advent's primary care physician for the relevant insured period from January 2007 through June 2010.  Treatment records from this time period indicate that Advent was treated for headaches, hypertension, fibromyalgia, and anxiety.  (Tr. 349-63, 367-73,

_____

[1]  Because the relevant issue herein revolves around the credibility of Advent's pain symptoms associated with fibromyalgia and migraine headaches, cataloguing Advent's mental health treatment is unnecessary.

2

560-78.)  On September 11, 2009, Dr. Bogar noted ongoing headaches, as well as chronic neck and shoulder pain.

Advent was seen by her treating neurologist, Atanase R. Craciun, M.D., from February 2008 through August 2008.  (Tr. 180, 220-46.)  During this period, Advent made approximately six office visits complaining of ongoing headaches.  Dr. Craciun treated Advent's headaches with a multi-drug regimen, finding that she had migraines with limited control.  (Tr. 180, 223-233.)  Dr. Craciun noted a diagnosis of chronic anxiety, POTS (postural orthostatic tachycardiac syndrome), and migraine headaches.  (Tr. 224.)  He prescribed modest amounts of Percocet or Vicodin at three visits, but stressed that narcotics should be used sparingly and were not an acceptable therapeutic modality.  (Tr. 221, 224, 231.)  During neurological examinations, Dr. Craciun noted no significant abnormalities and found normal muscle strength, gait, and mental status.  (Tr. 220-46.)

Advent was also treated at the Cleveland Clinic Headache Clinic from October 23, 2006 through February 6, 2009.  (Tr. 183-99, 202-06, 304-08, 317-22, 475-78.)  She was seen by both Jennifer Kriegler, M.D., a neurologist, and Linda Alberino, a certified nurse practitioner ("CRNP").  During this period, Advent made approximately eight office visits for treatment of ongoing headaches.

On April 4, 2007, Dr. Kriegler noted that while on Topamax prior to becoming pregnant, Advent's headaches had decreased from occurring daily to a few per month.  (Tr. 197-99.)  However, due to pregnancy, Topamax was discontinued and the headaches returned daily.  *Id.*

On May 16, 2008, Advent was prescribed Vicodin to be used sparingly.

On July 21, 2008, Dr. Kriegler noted that Advent was having migraines four times per

3

week, lasting about 12 hours, despite her medications.  (Tr. 183-87.)  Dr. Kriegler also noted a

recent diagnosis of Fibromyalgia Syndrome ("FMS").  (Tr. 184.)  Dr. Kriegler cautioned Advent

about taking too many medications and seeing too many physicians without coordinating her

care.  (Tr. 185.)  She advised Advent to stop taking all over-the-counter medications, triptans,

and pain medications and to limit the use of short-acting analgesics and triptans to less than two

doses per week.  *Id.*

On September 29, 2008, Advent complained of daily headaches as well as neck and

shoulder pain.  (Tr. 317-22.)  She received an occipital nerve injection.  On November 20, 2008,

Advent complained of daily headaches and neck pain.  (Tr. 304-08.)  She was diagnosed with

cervical syndrome of the neck and prescribed Vicodin as needed.  *Id.*  Advent's last visit to the

Headache Clinic was on February 26, 2009.  Dr. Kriegler gave Advent a Botox injection and

advised her to stop using Percocet.  (Tr. 475-78.)

On September 8, 2008, Advent started treatment at the Cleveland Clinic Pain

Management Department.  Through May 5, 2010, Advent made approximately twenty-eight

office visits.  (Tr. 390-97, 402-05, 424-32, 435-74, 479-508, 515-526, 533-42.)  Advent at first

complained of headaches, but later headaches combined with left-sided neck pain.  (Tr. 488.)

During her treatment, she underwent a series of pain block injections, a radio frequency ablation

procedure ("RFA"), trigger point injections, Botox injections, and a Gon block.  None of these

procedures provided relief lasting more than three weeks.  Diagnosis included migraine

headaches and cervical syndrome.  (Tr. 439.)  On at least two office visits, the doctor noted that

Advent violated her pain management agreement by obtaining medication from multiple sources.

(Tr. 390-91, 488.)  When confronted at her last office visit, it was noted that Advent became

4

defensive and left when the doctor refused to prescribe any more narcotic pain medications. *Id.*

Advent also was seen a number of times at area emergency rooms: Cleveland Clinic Foundation on 6/21/06 (Tr. 214), Marymount Hospital on 2/10/08 (Tr. 178), Marymount Hospital on 2/6/10 (Tr. 376), Marymount Hospital 10/2/10 (Tr. 598), Metrohealth on 10/4/10 (Tr. 633.) Advent had diagnostic imaging testing with normal or unremarkable results including: a MRI of the brain on 2/27/08 (Tr. 250), a CT of the brain on 2/10/08 (Tr. 179), an x-ray of the cervical spine on 2/6/10 (Tr. 388), and an MRI of the brain on 9/20/10. (Tr. 642.)

### B.  Treating Physicians' Opinions

On October 15, 2008, Dr. Bogar completed a questionnaire. (Tr. 247-51.) He diagnosed migraines, fibromyalgia, anxiety, and hypertension.[2] (Tr. 248.) He noted that Advent had migraines three to four times a week and was being treated by a neurologist and a pain specialist. (Tr. 248.) He indicated that her symptoms included nausea, vomiting, and migraine aura including photophobia. *Id.* Advent's treatment included the following medications: Rilpax, Elavil, Cymbalta, and Topamax. *Id.* Additionally, Advent had received pain block injections from a pain specialist on two occasions. (Tr. 249.) Dr. Bogar further noted that Advent was last employed in 2006, was unable to hold a job due to illness, and was unable to work due to headache, nausea, vomiting, and photosensitivity. *Id.*

### C.  State Agency Reviewing Physicians' Opinions

On December 11, 2008, Paul Morton, M.D., a state agency reviewing physician,

---

[2] Attached to his questionnaire were two reports. The first was an MRI of Advent's brain dated February 27, 2008, which was unremarkable. (Tr. 250.) The second was a CT Scan of Advent's brain dated February 10, 2008, which showed no acute pathology. (Tr. 251.)

completed an assessment of Advent's physical capacity.  (Tr. 276-83.)  Dr. Morton explained

that he had considered Advent's allegations of migraine headaches and hypertension, as

contrasted with a normal brain CT scan and normal neurological findings.  *Id.*  Dr. Morton

considered Advent's reports of weakness, numbness, and soreness, but noted that her

neurological examinations were consistently intact.  (Tr. 281.)  Dr. Morton also noted Advent's

alleged frequent vomiting, but maintenance of a normal weight.  *Id.*  He opined that Advent was

able to perform work requiring a medium level of exertion.  (Tr. 277.)  On May 15, 2009, Gary

Hinzman, M.D., a state agency physician, reviewed Advent's records and affirmed the

assessment of Dr. Morton for medium work.  (Tr. 365.)

***Hearing Testimony***

At the hearing, Advent testified to the following:

- Her husband does most of the chores and cooking, but she does as much as she can.  (Tr. 33.)  Her parents help her do her laundry.  (Tr. 45.)

- She is the primary caregiver for her three-year old child.  (Tr. 33.) The child does not go to daycare.  *Id.*  When she has a migraine, she calls her mother or sister to help her take care of her child.  (Tr. 33, 46.).  This happens once or twice a week.  (Tr. 46.)  Once a month, her husband will have to stay home from work and take care of their child.  *Id.*

- She quit her most recent job as a sale associate at a boutique shop because her migraines were getting worse and her Postural Orthostatic Tachycardiac Syndrome (POTS) was interfering with her ability to stand.  (Tr. 34.)  She was pregnant at the time, but that is not the reason why she quit. *Id.*

- Previously, she was a full-time supervisor at a Marriott for three years, but missed a month of work due to her migraine headaches.  (Tr. 35.)   After returning from the absence, she was fired, but they allowed her to resign.  *Id.*  Her migraines have become more severe since working at the Marriott.  (Tr. 36.)

- Her migraines started worsening about four years ago, right before the birth of her daughter.  (Tr. 37.)  Now, she gets the migraines "almost daily, a few times a week."  *Id.*  A migraine can last all day and sometimes into the next day.  (Tr. 45.)

6

She vomits as a result of the migraines.  *Id.*  After the migraine, it takes a few days to get back to normal. This happens in cycles.  *Id.*

- She takes medication for high blood pressure.  (Tr. 39.)  Blood pressure in itself does not infringe on her ability to work.  *Id.*  It infringes on her ability to work when it causes a flare-up in her POTS.  *Id.*  The flare-ups are controlled by the blood pressure medication.  *Id.*  Flare-ups cause her to lose her balance and sway.  (Tr. 41-42.)

- She has fibromyalgia, for which she was prescribed Savella and Lyrica.  (Tr. 37, 42.)  At the onset of a fibromyalgia flare-up or a migraine, she takes oxycodone which causes her to lie down.  (Tr. 43.)  All these medications make her tired.  *Id.*

- The other medications she takes are Cardizem, Seroquel for depression, Zanaflex which is a muscle relaxer for pain, and Imitrex for migraines.  (Tr. 43.)  The Imitrex makes her sleepy.  *Id.*

- She exercises once or twice a week to a yoga DVD, but she cannot tolerate it for long.  (Tr. 44.)  Her only other exercise is keeping up with her three-year old child.  *Id.*

The ALJ posed the following hypothetical to the VE:

[A]n individual the claimant's age, education and work experience, who is able to perform a medium level of work.  Also limited to tasks that are simple, routine and repetitive.  And avoiding exposure to hazards such as dangerous machinery and unprotected heights.

(Tr. 51.)  The VE testified that such a person could not perform Advent's past relevant work, but could perform other jobs such as: hospital cleaner, medium unskilled, (8,100 locally, 26,200 state-wide, 815,000 nationally) and the following light, unskilled jobs: sales attendant (4,000 locally, 12,000 state-wide, 336,000 nationally) and cashier (15,500 locally, 46,400 state-wide, 1,104,000  nationally).  (Tr. 52.)  In a second hypothetical, the ALJ added restrictions for only brief or superficial interaction with co-workers and the public to accommodate an individual with depression and anxiety.  The VE testified that the above three positions would allow such superficial interaction with co-workers and the public.  (Tr. 53.)  However, the VE testified that

adding the limitation of never climbing ladders, ropes or scaffolds to the hypothetical would lower the cleaner job to the light level of exertion and limit the numbers to 4,000 locally, 13,000 state-wide and 403,000 nationally.  (Tr. 53-54.)  The VE testified that adding occasional balancing to the hypothetical would have no impact.  (Tr. 54.)  Finally, the VE testified that missing four to five days of work a month would cause the hypothetical person to be unemployable.  (Tr. 55.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

---

[3]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Advent was insured on her alleged disability onset date, January 1, 2007 and remained insured through June 20, 2010.  (Tr. 12.)  Therefore, in order to be entitled to POD and DIB, Advent must establish a continuous twelve month period of disability commencing between these two dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Advent established medically determinable, severe impairments due to adjustment disorder with mixed anxiety and depressed mood, migraines, fibromyalgia, high blood pressure, and POTS.  (Tr. 14.)  However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Advent was found incapable of performing her past relevant work, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work.  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Advent is not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");  *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

9

defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

### Sentence Six Remand Based on New and Material Evidence

Advent submitted additional medical records to the Appeals Council and now requests a remand for consideration of new evidence in accordance with section six of 42 U.S.C. § 405(g). On August 25, 2011, the Appeals Council issued an Order specifying that it had received the following additional information: Exhibit 28F: Medical Records from Cleveland Clinic Foundation dated November 23, 2010, through February 15, 2011; Exhibit 29F: MRI Results dated January 24, 2011; Exhibit 30F: Treatment Records from Eric Baron, D.O., dated January 24, 2011, through May 25, 2011; Exhibit 31F: Medical Records from Hillcrest Hospital dated March 30, 2011; and, Exhibit 32F: Medical Records from Marymount Hospital dated January 7, 2011, through January 24, 2011.  (Tr. 5.)  In its Notice, the Appeals Council noted consideration of the additional evidence, but found that it did not provide a basis for changing the ALJ's decision.  (Tr. 1-2.)  Advent, however, points to two specific documents that she believes should be considered as new and material evidence: (1) a January 24, 2011 MRI scan of her cervical spine, and (2) a January 17, 2011 bone scan of her shoulders.  (Tr. 665, 667.)

Evidence first submitted to the Appeals Council may only be considered to determine whether the case should be remanded under section six of 42 U.S.C. § 405(g).  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Washington-Wheeler v. Comm'r of Soc. Sec.*, 2010 WL 376329 at *1, n. 2 (E.D. Mich., Jan. 26, 2010).  The Court cannot remand for consideration of such evidence unless the evidence is new and material and good cause existed for the failure to incorporate it into the record at the administrative level.  42 U.S.C. § 405(g).

11

**A.   New and Material Evidence**

Evidence is new if it was not in existence or was unavailable during the administrative proceeding.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Here, the evidence consists of treatment records and tests that post-date the ALJ's decision.  As such, the evidence is arguably "new."

Evidence is "material" for purposes of a sentence six remand only if it is time-relevant, *i.e*., either relates to the period on or before the date the ALJ rendered his decision.  *See, e.g., Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 478 (6th Cir. 2003).  The Sixth Circuit has observed that "[e]vidence of disability obtained *after* the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin*., 88 Fed. Appx. 841, 845 (6th Cir. 2004) (emphasis added); *Walton v. Astrue*, 773 F. Supp. 2d 742, 750 (N.D. Ohio 2011).  A claimant must provide medical evidence of her impairments "during the time you say that [she is] disabled." 20 C.F.R. § 404.1512(c).  The crucial date in a social security case is the "date [that] claimant's insured status expired."  *Barnett v. Sec'y of Health & Human Servs.*, No. 86–3111, 1987 WL 36614, at *3 (6th Cir. 1987).  Medical evidence dated after a claimant's expiration of insured status is only relevant to a disability determination where the evidence "relates back" to the claimant's limitations prior to the date last insured.  *Id*.  Furthermore, evidence is "material" only if there is a reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered.  *Foster*, 279 F.3d at 358.

The medical records submitted are dated after Advent's insured status expired on June 30, 2010.  Nonetheless, Advent argues that the records are material because (1) they provide objective support to earlier diagnoses and, as such, pertain to her medical condition during the

12

relevant period of her disability claim, and (2) the evidence would have supported a different decision. (ECF No. 11 at 13-14.) Advent asserts that "the neck disc problem may well have been a contributing factor in Plaintiff's headaches." *Id.* at 14. She further avers that the ALJ "would presumably have found a severe impairment in Plaintiff's neck and/or shoulders." *Id.* Advent's conclusions are not supported by these records. The MRI of the cervical spine showed, at most, mild abnormalities. (Tr. 665.) While the shoulder bone scan showed chronic degenerative changes (Tr. 667), Dr. Covington described it as "unremarkable." (Tr. 650.) Moreover, Advent suffered an intervening car accident on January 7, 2011, approximately six months after her last insured date. Though she was diagnosed with both neck and shoulder sprains, X-rays of the shoulders at the ER showed no sign of degenerative changes. (Tr. 708.)

The medical records do not relate to the relevant time period before the denial of benefits and do not show significant abnormalities that would corroborate Advent's disability claim. Therefore, Advent has failed to establish that the ALJ's consideration of this evidence would likely have altered his decision.

### B. Good Cause

"It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) (citations omitted). The Sixth Circuit has observed that it "takes a 'harder line' on the 'good cause' test," explaining that a claimant "must give a valid reason for failing to obtain relevant examinations prior to the hearing." *Cotton*, 2 F.3d at 695. In other words, good cause exists where the failure to present the evidence during the administrative proceeding was reasonably justified. *Foster*, 279 F.3d at 357.

13

Here, Advent's primary argument on good cause appears to be that the records "could not have been procured any earlier." (ECF No. 11 at 13.) Between the onset of disability, January 1, 2007, and the date last insured, June 20, 2010, Advent was treated for her headaches and complaints of neck and shoulder pain by her primary care physician as well as numerous neurologists and pain specialists. (Tr. 180, 183-99, 202-06, 220-46, 304-08, 317-22, 349-63, 367-73, 390-97, 402-05, 424-32, 455-508, 515-26, 533-42, 560-78.) In fact, Advent was diagnosed with cervical syndrome as early as November 20, 2008. (Tr. 304-08.) She also was seen numerous times at area emergency rooms. (Tr. 178, 214, 376, 598, 633.) Advent has frequently had diagnostic imaging testing with normal or unremarkable results. (Tr. 179, 250, 388, 642.) Given this long standing medical history, the argument that "it could not have been procured any earlier" is unpersuasive. Therefore, Advent has not met her burden of establishing good cause.

In conclusion, the evidence fails to meet the criteria for a sentence six remand as Advent has failed to meet her burden of showing that the evidence is new and material and that good cause existed for not presenting the evidence earlier.

### Credibility Analysis

Advent claims that the ALJ failed to properly evaluate her complaints of pain. She takes issue with the ALJ's analysis with respect to her principle impairments: migraine headaches and fibromyalgia. (ECF No. 11 at 17-19.) Advent contends that the ALJ only mentioned complaints of pain in passing, never engaging in a specific analysis. *Id.* at 18. She describes the ALJ's analysis as "at best superficial." *Id.* at 19. The Commissioner asserts that the ALJ provided a thorough analysis of the pain evaluation factors and, based on the entire case record, he provided

specific reasons supported by substantial evidence.  (ECF No. 14 at 14-15.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step evaluation process.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

If the claimed pain is not substantiated by the medical record, the ALJ must make a credibility determination based on the entire case record.  *Id*.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent

15

reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also, Felisky,* 35 F.3d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross* v. *Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

The ALJ expressly noted that he had considered Advent's subjective complaints in accordance with the required two-step process.  (Tr. 17.)  The ALJ accepted that Advent suffered from various severe impairments, including migraines and fibromyalgia.  (Tr. 14.)  He found that "the medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Tr. 17.)  However, the ALJ dismissed Advent's statements concerning the intensity, persistence, and limiting effects of the symptoms as not credible to the extent they were inconsistent with his RFC finding.  (Tr. 17.)

In his decision, the ALJ set forth seven factors that he considered in the credibility assessment including specific citations to medical records and medical source opinions, objective clinical findings, treatment regimen, medication use, and activities.  (Tr. 17-19.)  The ALJ noted the following:

> There are several indications that claimant's functional limitations may not be as severe as alleged.  First, all tests, including magnetic resonance imaging (MRI) and computerized tomography (CT) scans of the claimant's brain were normal and unremarkable. (Exhibit 3F, pages 1 and 2) (Exhibit 9F, pages 4 and 5) (Exhibit 26F, page 2)  Second, although the claimant has had migraines for many years, she worked steadily until 2006 when she quit her job.  Third, the claimant engaged in extensive daily activities of daily living, as described on page four, above.  Fourth, although the claimant alleged that her condition prohibits her from exercising (Exhibit 4E, page 5), the claimant's treating physician actually recommended that the claimant engage in an "exercise regiment" including "yoga

16

and daily exercise." (Exhibit 26F, page 7)  Fifth, the claimant has no history of
psychiatric hospital admissions. (Exhibit 10F, page 2)  Sixth, as Dr. Morton
highlighted, the claimant maintains a normal weight despite alleging frequent
vomiting. (Exhibit 13F)  Seventh, as Dr. Long pointed out, "it does not appear
that [the claimant] was having a severe headache at the pscyh CE or at the various
outpatient visits. The frequency of the migraines is based on the claimant's
allegations." (Exhibit 18F)

(Tr. 18.)

Advent takes issue with the ALJ's second and third factors.  She contends that the ALJ's

discounting her disabling headaches did not take into account her testimony that she quit her job

due to the increased severity of her headaches.  (ECF No. 11 at 19, *citing* Tr. 34, 37.)

Additionally, she contends that the ALJ did not incorporate the medical records supporting her

escalating headaches.  *Id.*, *citing* Tr. 173, 402.  Furthermore, Advent believes that the ALJ's

recitation of her daily activities is misleading in that Advent "only performed those activities on

the days when she was not having a headache, and that she required assistance otherwise."  *Id.* at

19.

An ALJ's credibility determinations are not limited to the medical evidence, and there are

seven other factors an ALJ should consider.[4]  The ALJ need not analyze all seven factors, but

should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch

v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).  Herein, the ALJ gave seven reasons

---

[4]  The seven factors are: (1) the individual's daily activities; (2) the location, duration,
frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the
symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual
takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the
individual receives or has received for relief of pain or other symptoms; (6) any measures other
than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any
other factors concerning the individual's functional limitations and restrictions due to pain or
other symptoms.  SSR 96-7p, Introduction; *see also Cross*, 375 F. Supp. 2d at 732.

17

for challenging Advent's credibility, most focusing on the medical evidence or the first factor –

Advent's daily activities.  Notably, the ALJ largely ignores the other six factors.  Glaringly

absent is any discussion of the frequency and intensity of Advent's pain, the various medications

and other treatment Advent received, and the side effects of her medications.[5]  In addition, the

ALJ's discussion of Advent's "extensive activities of daily living" is incomplete.  It appears to

be uncontested that the claimant is quite functional when she is not suffering from migraine

headaches.  However, the ALJ's credibility analysis completely neglects to discuss the frequency

and intensity of Advent's alleged symptoms, specifically her migraines, or the efficacy of her

medications in treating them.  Though each of the seven factors need not be addressed in every

opinion, the ALJ's failure to discuss arguably the two most relevant factors renders his

credibility analysis deficient under SSR 96-7p.  While the ALJ was not bound to find Advent's

allegations credible, the underlying analysis was insufficient under the Administration's

procedural rules.  "[A court] cannot uphold a decision by an administrative agency ... if, while

there is enough evidence in the record to support the decision, the reasons given by the trier of

fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v.

Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *Pollard v. Astrue*, 2012 U.S. Dist. LEXIS 85290 (S.D.

Ohio June 20, 2012) ("[A]s a rule, the ALJ must build an accurate and logical bridge between the

evidence and his conclusion.")

As the ALJ failed to properly conduct the credibility analysis, Advent's third assignment

of error is well-taken.

---

[5]  The ALJ did, however, mention that a treating physician actually recommended exercise,
namely yoga – an activity that Advent testified she attempts once or twice a week, but which
she cannot do for long because "it's very exerting."  (Tr. 44.)

*Opinions of Treating Physicians*

Advent also argues that the ALJ improperly rejected the opinions of her treating physicians, Dr. Atanase R. Craciun and Dr. Kevin Bogar.  (ECF No. 11 at 17-18.)  The Commissioner argues that there is substantial evidence to support giving no weight to Advent's treating physicians.  (ECF No. 14 at 12.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]

---

[6]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

19

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

In the present case, the ALJ rejected Dr. Craciun's opinion because "it is not clear what this opinion was based on; it consists of no more than mere checkmarks without explanations." (Tr. 18.)[7]  Dr. Craciun's opinion consisted merely of checked boxes about Advent's alleged limitations and failed to provide supporting explanations or objective medical findings to support his conclusions.  The ALJ also gave no weight to the opinion of Dr. Bogar because "the opinion of whether a claimant can work is reserved to the Commissioner."  (Tr. 19.)[8]

Since the Court found that remand is necessary, the Court need not address whether the ALJ's discussion of the treating physicians' opinions satisfies proper procedural standards. Admittedly the ALJ's discussion is rather brief.  Upon remand, the ALJ should conduct a more

---

[7]  The ALJ also commented that the completion of Dr. Craciun's opinion within ten days of the claimant's date of last insured was suspicious.  (Tr. 18.)

[8]  SSR 96-5p discusses the evaluation of medical source statements on issues reserved to the Commissioner.  "[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record."  *See* SSR 96-5p; 20 C.F.R. § 404.1527(e).

thorough analysis.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge


Date: July 30, 2012.